Filed 2/11/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ARMANDO MILAN MARRERO, Defendant and Appellant. | D076712 (Super. Ct. No. SCD268818) |

APPEAL from an order of the Superior Court of San Diego County, Amalia L. Meza, Judge. Affirmed in part, reversed in part with directions.

The Clendenin Firm and Matthew Clendenin, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Armando Milan Marrero pleaded guilty to driving under the influence of alcohol and causing bodily injury to another person (Veh. Code, § 23153, subd. (a)) with sentencing enhancements for great bodily injury (Pen. Code, § 12022.7, subd. (a)), multiple victims (Veh. Code, § 23558), and a blood

alcohol concentration of 0.15 percent or more (*id.*, § 23578). The trial court suspended imposition of sentence for five years and granted formal probation, on the condition (among others) that Marrero spend 180 days in local custody. At a subsequent hearing, the court ordered restitution in the amount of $358,047.79, covering $350,000 in attorney fees and approximately $8,000 in travel expenses.

Marrero appeals. He contends (1) the attorney fees order is excessive, (2) the trial court violated his right to due process by admitting illegible handwritten attorney time records into evidence, and (3) the court violated due process by awarding travel expenses without adequate notice. We disagree with Marrero's first two contentions but agree with the third. We therefore reverse the award of travel expenses with directions to rehear the matter on proper notice, and otherwise we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

For purposes of this section, we state the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.) Additional facts will be discussed where relevant in the following section.

On July 14, 2016, twenty-year-old Marrero drank a large amount of alcohol. Later, while driving on a freeway, he struck the back of another car, causing it to crash down an embankment. Two occupants, Irish nationals, suffered serious and lasting injuries. A third occupant was apparently not seriously harmed.

The two injured victims retained an attorney, Gary Sernaker. They agreed to pay Sernaker a 25 percent contingency fee for his services. Sernaker investigated the matter and communicated with Marrero's father (an attorney) and their insurance company. Fourteen months after his

2

retention, Sernaker made a $1,499,900 policy limits demand on behalf of his clients. (The remainder of the policy, $100, was paid to the third occupant of the victims' car.) Two weeks later, the two victims settled with Marrero for that amount, specifically reserving the right to pursue reimbursement of their attorney fees in Marrero's criminal case.

The two victims engaged in mediation to apportion the $1,499,900 settlement proceeds. They paid Sernaker $375,000 in accordance with their contingency fee agreement.

In Marrero's criminal case, the prosecutor requested that the victims be awarded $375,000 in restitution based on the actual fee paid to Sernaker. Marrero objected. He argued that the fee was unreasonable because the matter settled so quickly after Sernaker's policy limits demand. Marrero maintained that the court should (1) use the lodestar method to determine the fee award and (2) reduce the fee award based on any portion attributable to the recovery of noneconomic damages.

In response, the prosecutor filed a motion to set restitution. The motion again requested $375,000 in restitution based on the actual fee paid by the victims. The prosecutor argued that the court was not required to use the lodestar method to make a fee award. But if it did, the victims would still be entitled to an award of approximately $150,000 based on Sernaker's hours worked and his hourly rate.

The trial court issued a detailed order reviewing the factual and legal background of the dispute. It requested supplemental briefing regarding whether the $375,000 attorney fees amount was reasonable under the lodestar method.

In response, the prosecutor stated that the lodestar method would result in approximately $135,000 based on a bare calculation of hours

3

worked, hourly rate, and expenses. But she argued that such a calculation did not account for other relevant factors, such as the contingency fee arrangement. She asserted that the entire fee incurred by the victims, $375,000, was reasonable. The prosecutor noted that the victims had also incurred additional economic damages, including approximately $8,000 in travel expenses, and requested those be included in any restitution award.

In support, the prosecutor attached a declaration from Sernaker. He explained that his retainer agreements with the victims provided for a fee of 25 percent of their gross recovery. In this case, the victims paid $375,000 in fees, or 25 percent of $1,499,900. Sernaker stated that he spent 339.5 hours on the matter and had an hourly rate of $375, which resulted in approximately $125,000 in fees if billed hourly. He also incurred approximately $8,500 in expenses on behalf of the victims. He confirmed that the victims had incurred approximately $8,000 in travel expenses, including for the mediation. To determine his approximate hours worked, Sernaker reviewed his client files and created after-the-fact timesheets. These handwritten timesheets included dates, hours worked, and a description of the work performed.

Marrero's response to the court's order asserted that Sernaker's timesheets were "completely illegible and unintelligible and being so ask[] the Court to speculate what these entries mean." But, using the timesheets, Marrero calculated that Sernaker had worked only around 25 hours on the matter prior to settlement. Estimating that half of this time was spent to recover economic damages (and half noneconomic damages), Marrero asserted that the victims were only entitled to an award of approximately $4,600 in fees. (Marrero later revised this estimate substantially upwards, as discussed below.) Marrero objected to all of Sernaker's time "after the

4

Settlement Agreement was drafted as by that date the victims had recovered their economic damages and had provided [Marrero] a full release of any and all claims." He also objected to the victims' travel expenses.

In advance of the restitution hearing, Marrero requested an order compelling the production of legible timesheets and continuance of the hearing. Marrero's counsel stated that he had requested better photocopies of the timesheets multiple times from the prosecutor. Although the prosecutor at one point submitted darker copies, Marrero's counsel maintained they were still illegible. Marrero argued, "Defendant should not be forced to hear Mr. Sernaker explain what his timesheets say for the first time on the stand."

The restitution hearing spanned two days. The trial court began by denying Marrero's request for more legible timesheets and a continuance. The court discussed with the parties whether travel expenses were at issue. The prosecutor stated that she had discussed a stipulation covering travel expenses with Marrero's counsel. Marrero's counsel informed the court there would be no stipulation. The prosecutor remarked that the victims might have to fly out from Ireland to testify regarding the expenses. The court indicated that the matter before it was limited to attorney fees; the case had not been assigned to the court for all purposes. Marrero's counsel responded "for the record" that flying the victims out to San Diego would not be necessary. Marrero's contention was that recovery of the expenses was barred by the victims' settlement agreement. He did not dispute they were actually incurred.

The court heard testimony from Sernaker, who described his retention by the victims and his legal work on their behalf. As part of his retainer agreement, the victims agreed to pay Sernaker a contingency fee of

5

25 percent of their gross recovery. The agreement specified that the percentage would increase to 33 percent if Sernaker filed a formal complaint, but Sernaker agreed in writing to waive that increase because the victims were from Ireland and because they agreed to be represented together. Sernaker considered his fee to be common and "on the low end" of the range of potential contingency fees. Sernaker also waived reimbursement of some expenses because he considered his fee to be substantial. He confirmed the victims paid him $375,000 in attorney fees based on the retainer agreement.

Sernaker explained that he does not normally keep track of his time when he is paid on contingency. But for this case, Sernaker looked through his files and attempted to estimate the time he spent working on behalf of the victims. He believes the resulting timesheets underestimated his total time because he did not include things like waiting in the hospital with the victims' families. Sernaker maintained that it was impossible to divide his time between efforts to recover economic and noneconomic damages. He said, "Everything falls into the same pot. They're sort of indivisible when you're overall trying to get the best result for your client that you can."

As part of his work, Sernaker investigated other potential causes of the crash and responsible parties, such as the government (based on the condition of the roadway), the vehicle (based on its condition), and anyone who supplied alcohol to Marrero. Sernaker reviewed records related to Marrero's activities and communications on the day of the crash, and he deposed Marrero on the issue of social host liability. He helped the victims obtain insurance coverage for their medical expenses and worked with the hospital to deal with their medical bills. Sernaker also investigated potential medical malpractice by the physicians who treated the victims. In the end, Sernaker decided Marrero was the only available responsible party. He

6

investigated Marrero's liability thoroughly, communicated with the claims adjuster from Marrero's insurance company, and eventually made the policy limits demand.

Sernaker spent a large amount of time communicating with his clients and their families. He had to educate them regarding the American legal system, including the differences between criminal and civil law. During most of Sernaker's work, the victims were back home in Ireland.

On cross-examination, Sernaker agreed that the evidence established a "slam dunk" liability case against Marrero. But he believed that other issues, such as causation and damages, were less clear. Marrero's counsel questioned Sernaker in detail regarding the meaning of his timesheet entries and the nature of the work Sernaker performed.

During this questioning, the prosecutor objected to a line of questions highlighting Sernaker's work on the matter after the settlement agreement with Marrero was signed. After hearing argument, the court ruled that such questions were based on the incorrect premise that the settlement agreement cut off the victims' economic losses for purposes of restitution. The court explained that the victims continued to incur economic losses, i.e., attorney fees, after the settlement because they needed to engage in mediation in order to divide (and obtain disbursement of) the settlement proceeds. Similarly, the court rejected Marrero's contention that time Sernaker spent pursuing other potential defendants was not "time incurred in an effort to recover economic damages sustained by the victim as a result of the defendant's criminal conduct." It noted, however, that Marrero could pursue the argument that some time was incurred pursuing the recovery of noneconomic damages: "So if you want to point to noneconomic, that's up to you. The burden is on you to show me that some of these were noneconomic

7

losses. [¶] But third-party tortfeasors, I don't think it's appropriate to go there."

Sernaker, for his part, reiterated his belief that his time could not be divided between the pursuit of economic versus noneconomic damages. After review, he found only one entry, for half an hour, labeled "P&S," i.e., pain and suffering. On redirect, Sernaker confirmed that his fee could not be divided between the pursuit of economic versus noneconomic damages.

After Sernaker's testimony, the prosecutor contended that the victims were entitled to recover the entire $375,000 fee paid to Sernaker. She argued that the fee was reasonable both in general and in light of the factors to be considered in the lodestar analysis. The prosecutor noted that her request for travel expenses was still outstanding. To avoid another hearing, the prosecutor requested that the court award those expenses as well.

Marrero objected to the consideration of travel expenses, based on the court's statement at the prior day of hearing that it would only be considering attorney fees. As to those fees, Marrero maintained that the victims were only entitled to fees for work Sernaker performed before the settlement. As to one victim, Marrero calculated that Sernaker spent 69 pre-settlement hours on his case, for a total calculated fee of $24,315. As to the other, Marrero identified 106 pre-settlement hours, for a total calculated fee of $37,152. Marrero did not believe the facts supported any upward departure from the calculated fees. But he did assert that the court should apply a 25 percent offset based on one victim's alleged negligence (not wearing a seatbelt).

In its ruling, the court began with a bare lodestar calculation of $131,362, based on the total hours worked by Sernaker multiplied by his hourly rate. The court then considered various factors, including the novelty

8

and difficulty of the matter, Sernaker's skill, the displacement of other employment, and the contingent nature of the fee award. The court found that each factor supported an upward departure from the bare lodestar calculation. Moreover, the court was persuaded that the lodestar method was not an adequate method to determine restitution in a criminal case where, as here, the victims had paid a contingency fee. Taking all of the factors into account, and considering the potential inappropriateness of the lodestar method in general, the court awarded the victims restitution in the amount of $350,000 based on their attorney fees.

The court rejected Marrero's argument that fees for the recovery of economic damages could be separated from fees for the recovery of noneconomic damages. It stated, "So as to whether or not some of these fees were for noneconomic damages, I think all of them were for economic damages. You know, these kids were injured, and this lawyer was trying to get money for them to help them with their injuries. Those were clearly physical losses, economic losses. [¶] But even assuming that some of them could have been noneconomic, the *Fulton* [*People v. Fulton* (2003) 109 Cal.App.4th 876 (*Fulton*)], case instructs that when fees cannot reasonably be divided between economic losses and noneconomic losses, the victim is entitled to be fully reimbursed for all actual and reasonable attorneys' fees."

As to travel expenses, the court reasoned that the prosecutor had not included them in her motion to set restitution because she anticipated a stipulation would cover them. The court was satisfied the expenses were incurred by the victims and were not barred by the settlement agreement. The court therefore included approximately $8,000 in travel expenses in its restitution award.

9

DISCUSSION

I

*Attorney Fees as Restitution*

"Restitution is 'intended to make the victim whole.' " (*People v. Grundfor* (2019) 39 Cal.App.5th 22, 30 (*Grundfor*).) "The restitution order 'shall be of a dollar amount sufficient to fully reimburse the victim' for economic losses caused by the defendant's criminal conduct." (*People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409.) " '[T]he trial court is vested with broad discretion in setting the amount of restitution; it may " 'use any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole . . . .' " ' [Citation.] 'Thus, while the amount of restitution cannot be arbitrary or capricious, "[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. . . ." [Citation.]' [Citation.] 'In determining the amount of restitution, all that is required is that the trial court "use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." [Citations.] The order must be affirmed if there is a factual and rational basis for the amount.' " (*People v. Beaver* (2010) 186 Cal.App.4th 107, 129.)

Penal Code section 1202.4, subdivision (f)(3)(H) identifies "[a]ctual and reasonable attorney's fees" as an example of economic loss recoverable in a restitution order. Recoverable attorney fees include "those incurred in the recovery of damages the victim suffered as a result of the defendant's criminal conduct." (*Fulton, supra*, 109 Cal.App.4th at pp. 883-884.) The damages for which attorney fees are recoverable are limited to other items of

restitution otherwise permitted by the statute.  (*Id*. at p. 885.)  Because restitution is limited to economic losses, this limitation precludes recovery of attorney fees incurred solely to recover noneconomic losses.  But a victim is not prohibited from recovering attorney fees "if those fees are incurred to recover both economic and noneconomic losses.  Because the Legislature has directed that a victim be 'fully reimburse[d]' for economic losses [citation], it would be improper to reduce the attorney fees incurred to obtain economic damages merely because those same attorney fees also led to the recovery of nonrecoverable damages (e.g., pain and suffering damages).  Moreover, because of the strong public policy seeking to provide crime victims with direct restitution for all the 'losses they suffer' (Cal. Const., art. I, § 28, subd. (b)), when fees cannot be reasonably divided between the pursuit of economic losses as opposed to noneconomic losses, the victim is entitled to be fully reimbursed for all actual and reasonable attorney fees." (*Fulton*, at p. 885; accord, *Grundfor*, *supra*, 39 Cal.App.5th at p. 30.)

In *People v. Millard* (2009) 175 Cal.App.4th 7 (*Millard*), this court considered the proper standard for determining whether a victim's claimed attorney fees were reasonable.  In the underlying action, the trial court found that an attorney fee of $366,666, based on a 33 percent contingency fee, was " 'unconscionable' " because the attorney did little work.  (*Id*. at p. 22.)  It nonetheless felt compelled to use the fee as the basis for its restitution award. (*Id*. at pp. 22-23.)  *Millard* held that the trial court abused its discretion under these circumstances "because it either:  (1) awarded attorney fees it found were unconscionable/unreasonable; or (2) even if it implicitly found those fees were reasonable based solely on the contingency fee agreement, it did not apply the correct legal standard in determining the amount of reasonable attorney fees." (*Id*. at p. 31.)

11

*Millard* concluded that the trial court was required by Supreme Court precedent to use the lodestar method to determine the reasonableness of the fee award. (*Millard*, *supra*, 175 Cal.App.4th at p. 32, citing *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134 (*Ketchum*), and *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) The lodestar method begins with the calculation of hours worked multiplied by a reasonable hourly rate for such work. (*Millard*, at p. 32.) A court may then "make adjustments upward or downward based on [other factors], including whether there is a contingency fee arrangement. [Citation.] After considering all relevant factors, a court may ultimately, but is not compelled to, award as reasonable those fees set forth in a contingency fee agreement." (*Id*. at p. 33.) *Millard* directed the trial court to use the lodestar method "unless the People on remand show the Legislature intended another method to be used in determining reasonable attorney fees" in the context of restitution. (*Ibid*.)

Later, in *People v. Taylor* (2011) 197 Cal.App.4th 757, 759 (*Taylor*), the court disagreed with *Millard* to the extent it required a lodestar analysis in every case. *Taylor* noted that the authority cited by *Millard* to support the lodestar requirement expressly cautioned that it was " 'not mandating a blanket "lodestar only" approach; every fee-shifting statute must be construed on its own merits and nothing in [the relevant] jurisprudence suggests otherwise.' " (*Id*. at pp. 762-763, quoting *Ketchum*, *supra*, 24 Cal.4th at p. 1136.) *Taylor* determined that victim restitution "presents different interests" from the civil fee awards typically subject to the lodestar analysis. (*Taylor*, at p. 763.) "The attorney fee awards addressed in *Ketchum* [and similar cases] are intended to encourage litigation which benefits the public or discourage litigation contrary to the public interest. Fee awards in these cases must be finely tuned so that litigation is neither excessively encouraged

12

nor discouraged.  Victim restitution for attorney fees is not intended to encourage or discourage litigation; the civil case in which the victim incurs attorney fees is separate from the criminal case where the restitution is awarded.  Instead, victim restitution for attorney fees is intended to make the victim whole." (*Ibid.*)

"Applying the lodestar to attorney fees incurred by crime victims overlooks the fundamental purpose of the statutory and constitutional right to victim restitution, awarding 'full restitution' to the victim absent 'compelling and extraordinary reasons for not doing so . . . .' [Citation.]  Since a victim will likely have to pay a contingent fee in any personal injury action resulting from the crime, evidence that the victim incurred the contingent fee is prima facie evidence of a loss entitling him to compensation." (*Taylor*, *supra*, 197 Cal.App.4th at p. 764.)  "[W]here there is uncontradicted evidence the victim incurred attorney fees as a result of the defendant's actions, it is not an abuse of discretion to award restitution for the fee without resorting to the lodestar method." (*Ibid.*)

In *Grundfor*, *supra*, 39 Cal.App.5th at page 30, the court agreed with *Taylor* that a lodestar analysis was not a prerequisite to a restitution award. "The trial court has broad discretion when it sets the amount of attorney fee restitution, and ' "may use any rational method" ' to calculate it [citation] so long as the calculation reflects the actual, reasonable fees paid [citation]. This includes basing the calculation on a contingency fee." (*Ibid.*)

Here, the trial court engaged in a hybrid analysis.  It calculated a lodestar based on Sernaker's hours worked and his hourly rate.  It concluded the lodestar should be increased based on, among other things, the contingent nature of his fee.  It also specifically referenced *Taylor* and found its reasoning persuasive.  Blending the two perspectives, the court explained,

"So the court takes into account the final factor of the [l]odestar and also considers that [a contingency fee] is a fact of life in these crime victim cases, especially here. These were kids from Ireland, and they were working and students back in Ireland who were not savvy about how to obtain recovery for their injuries. They didn't have any assets. So there was no way they could hire a lawyer and pay him or her the hourly rate of $350 an hour plus costs. That would not have been possible. [¶] . . . [¶] So having taken into account all of those factors and the reasoning in the *Taylor* case regarding the nature of contingency fee cases in these types of situations, the [c]ourt is going to do an upward adjustment and award $350,000 in attorneys' fees."

The trial court's analysis was understandable in light of the conflicting authorities discussed above. And it was, in fact, a rational method for calculating restitution in this case. The court began with a lodestar analysis but recognized that the victims' contingency fee arrangement was the most important factor. It awarded what it considered a reasonable fee of $350,000, more than the bare lodestar calculation but less than the full contingency fee paid by the victims. The court's award was neither arbitrary nor capricious, and we discern no abuse of discretion.

Marrero first argues that the trial court's determination in *Millard*, that a $366,666 fee was "unconscionable" for between 100 and 200 hours of work, should simply be applied here as well. This argument ignores our standard of review and the trial court's obligation to assess each case on its own facts. Here, the trial court awarded what it considered a reasonable fee. Unlike the trial court in *Millard*, which either concluded the amount awarded was unreasonable or applied the wrong legal standard in evaluating the request (*Millard, supra,* 175 Cal.App.4th at pp. 22-23, 31), the court here

14

made no such error. The fact that its conclusion differs from the determination in *Millard* does not demonstrate an abuse of discretion.

Next, Marrero argues that the trial court's initial lodestar calculation was flawed because it included hours recorded by Sernaker after the settlement agreement was signed. He claims, "By any construction, the additional time recorded by Mr. Sernaker after that date could not and was not spent on the recovery of economic damages from [Marrero]." The trial court did not abuse its discretion by considering these hours. They represented a substantial portion of the time Sernaker spent representing the victims, for which Sernaker was compensated by his contingency fee. This contingency fee—which did not vary based on hours worked—was the basis for the victims' restitution request. The court properly considered all of Sernaker's hours in assessing the extent of actual and reasonable attorney fees it should order as restitution.

Marrero argues that consideration of post-settlement hours provided a "forbidden windfall" to the victims. This argument rests on the faulty premise that the attorney fees paid by the victims were based on Sernaker's hours worked. Indeed, in his briefing, Marrero repeatedly asserts that the victims' "actual" attorney fees were approximately $125,000, based on Sernaker's hours worked and his hourly rate. This assertion is incorrect. The victims' actual attorney fees were $375,000. They paid this amount to Sernaker based on their 25 percent contingency fee agreement.

Marrero relies on the conventional application of the lodestar factors in civil cases and contends they do not support a "multiplier" in this case. But, as highlighted in *Taylor* and recognized by the trial court, the conventional lodestar analysis is often inappropriate in the restitution context. It "overlooks the fundamental purpose of the statutory and constitutional right

to victim restitution, awarding 'full restitution' to the victim absent 'compelling and extraordinary reasons for not doing so.' " (*Taylor*, *supra*, 197 Cal.App.4th at p. 764.) Marrero's criticism of the court's application of the lodestar factors does not establish that the fee award is unreasonable in light of the contingency fee actually paid by the victims.[1]

Marrero contends that the restitution order is "inequitable" and "punished [Marrero] for carrying a substantial amount of insurance." His misguided argument is worth quoting at length: "If the appellant, a minor, had carried the state mandated insurance of $15,000/$30,000 then the total fee that Mr. Sernaker would have charged his clients, and which would have been the subject of the restitution are attorney fees of $7,500. [Citation.] . . . The fact that the victims were able to recover more, and that Mr. Sernaker was able to charge more because Appellant was well insured does not change the underlying question of whether the fees incurred were reasonable. The inequity was compounded in this case by the tripling the amount of fees awarded."

Marrero appears to argue that, because the victims would have been severely undercompensated had Marrero carried less insurance, they cannot be heard to complain if they are only moderately undercompensated now. This argument is wholly unpersuasive. Among other things, it runs directly

---

[1]    We disagree, as did *Taylor*, with any suggestion in *Millard* that the lodestar method described in *Ketchum* is the exclusive method for determining the reasonableness of attorney fees for purposes of victim restitution. A trial court may, in its discretion, refer to the lodestar calculation and related factors in awarding actual and reasonable attorney fees. But it should be used with caution for the reasons described in *Taylor*. In this case, as discussed, the trial court used a rational calculation method in determining that the attorney fees actually incurred under the contingency fee arrangement were reasonable. (See *Grundfor*, *supra*, 39 Cal.App.5th at p. 31.)

16

counter to the purpose of restitution, which is to make the victims whole. (See *Grundfor*, *supra*, 39 Cal.App.5th at p. 30.)  It also misapprehends the purpose of the restitution order.  The order does not compensate Sernaker; he has already been paid.  It compensates the victims for their losses caused by Marrero's criminal conduct.  Those losses include the standard contingency fee paid to their attorney, out of a settlement that would otherwise have compensated them for their injuries.  There is nothing inequitable about ensuring that those losses are paid by Marrero, who caused the victims' injuries and was the reason the victims retained Sernaker in the first place. (See *People v. Pinedo* (1998) 60 Cal.App.4th 1403, 1406.)[2]

II

*Sernaker's Timesheets*

Marrero contends the trial court violated his right to due process by "denying [him] access to a legible copy of the billing records" created by Sernaker.  He argues, "As a result, [he] could not properly prepare for the restitution hearing, and could not challenge Mr. Sernaker's characterization of the time entries at the hearing."

"We review procedural due process claims de novo because 'the ultimate determination of procedural fairness amounts to a question of law.' "

_____

[2]    On reply, for the first time, Marrero argues that the court erred by preventing him from establishing whether or not the attorney fees incurred by the victims were for the recovery of economic damages, as opposed to noneconomic damages.  We do not consider arguments offered for the first time on reply. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 255.)  Even if we were to consider this argument, we would conclude Marrero has not shown error.  The court limited Marrero's questioning regarding third-party culpability, but it explicitly allowed questioning regarding economic and noneconomic recovery:  "So if you want to point to noneconomic, that's up to you.  The burden is on you to show me that some of these were noneconomic losses.  [¶]  But third-party tortfeasors, I don't think it's appropriate to go there."

17

(*In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241.) "The scope of a criminal defendant's due process rights at a hearing to determine the amount of restitution is very limited: ' "A defendant's due process rights are protected when the probation report gives notice of the amount of restitution claimed . . . , and the defendant has an opportunity to challenge the figures in the probation report at the sentencing hearing." ' " (*People v. Cain* (2000) 82 Cal.App.4th 81, 86 (*Cain*).) The hearing itself may violate due process if the procedures employed by the trial court "are fundamentally unfair." (*Id.* at p. 87.)

*Cain* likewise considered a challenge to a trial court restitution order based on due process. (*Cain, supra,* 82 Cal.App.4th at p. 85.) The probation officer requested a restitution order of $3,500 to cover counseling expenses for the victim and her son. (*Ibid.*) The defendant sought to call the therapist to testify at the restitution hearing. (*Ibid.*) The trial court denied defendant's request. (*Ibid.*) On appeal, the court held that due process did not require the opportunity to call and cross-examine the therapist. (*Id.* at p. 87.) It explained, "The trial court violates the defendant's due process right at a hearing to determine the amount of restitution if the hearing procedures are fundamentally unfair. [Citation.] In this case, defendant had full and fair opportunity to present affirmative evidence that counseling received by the victim was not directly related to the crime. For example, defendant could have called an expert to show that in light of the length of the counseling sessions and/or the time gap between the crime and the counseling, the counseling could not have been related only to the crime. Defendant could have also introduced evidence of the victim's preexisting mental or psychological ailment or evidence that the victim was previously treated by a

18

mental health professional." (*Ibid.*, fn. omitted.) It therefore affirmed the restitution order. (*Id.* at p. 90.)

Marrero has not shown his due process rights were violated by his failure to obtain "a legible copy of the billing records" created by Sernaker. First, it appears the trial court considered the same copies that Marrero received. Any illegibility was a limitation of the evidence itself. Its use did not violate due process. Second, Marrero had the opportunity to cross-examine Sernaker. He was therefore able to challenge Sernaker's testimony regarding the time entries. Marrero has not shown that due process required that he be provided any particular evidence to aid in that cross-examination. Third, Marrero had "full and fair opportunity to present affirmative evidence" regarding Sernaker's time records and the reasonableness of the victims' attorney fees. (See *Cain*, *supra*, 82 Cal.App.4th at p. 87.) Under these circumstances, we conclude the restitution hearing was not fundamentally unfair. (*Ibid.*)

Marrero relies on several cases, but he does little to explain their applicability. In *Fremont Indemnity Co. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 965, 970-971, the court found a due process violation where a workers' compensation judge "contact[ed] and talk[ed] with the independent medical examiner by telephone and obtain[ed] additional medical reports from him after the case had been submitted." This situation is not comparable to the situation here. In *Oxford Preparatory Academy v. Edlighten Learning Solutions* (2019) 34 Cal.App.5th 605, 609, the trial court did not follow a published opinion because, among other reasons, the "defendant cited the case for the first time at the hearing and it 'would be manifestly unfair for the [c]ourt to condone such an argument by ambush.' " The appellate court reversed (*id.* at p. 613), so the point of Marrero's citation

19

is uncertain.  Marrero offers no explanation, and the trial court here made no comparable error.  In *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 288, the court recognized a trial court's inherent power to exclude evidence to ensure a fair trial and curb litigation abuses.  Marrero has not shown any basis for exclusion here.  Finally, *Grannis v. Ordean* (1914) 234 U.S. 385 and *Estate of Buchman* (1954) 123 Cal.App.2d 546 (*Buchman's Estate*) confirm the basic due process requirements of notice and opportunity to be heard, but these basic requirements were satisfied here with respect to the victims' request for attorney fees.  Marrero has not established any due process violation based on Sernaker's timesheets.

III

*Travel Expenses*

Marrero contends the court violated his due process rights by including travel expenses in its restitution order after ruling they were not at issue.  As noted, the trial court stated at the outset of the restitution hearing that travel expenses were not before it.  After noting the issue of travel expenses, and confirming "we're just talking about attorney's fee[s]," the court explained, "And I indicated, if you want to bring another restitution motion at some future time, go to Department 102.  This matter has not been assigned to this department for all purposes.  So I got this matter back in November for restitution for attorney's fees, and this has turned into, like, the case of the century, you guys . . . .  We're just talking about attorney's fees."  After Marrero confirmed his objection to travel expenses, the court stated, "I am hoping that after the attorney's fees is resolved, that the two sides will try to work it out so you're not flying people out here from Ireland for some additional restitution amounts.  So let's try and be reasonable."

20

In closing argument, the prosecutor first raised the issue of travel expenses again: "I would also add, and I understand this Court does not want to get into anything but attorneys' fees, but the problem we had at the last date is that travel expenses by the family were also incurred. . . . And I would hate to have to go back to Department 102 to essentially make that very simple argument instead of having them ordered now." Marrero objected to consideration of the request for travel expenses based on the court's prior statements.

"It is a fundamental concept of due process that a judgment against a defendant cannot be entered unless he was given proper notice and an opportunity to defend." (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1166; see *Buchman's Estate*, *supra*, 123 Cal.App.2d at pp. 559-560.) While Marrero was aware that the prosecution had requested travel expenses, he was explicitly told by the court they were not at issue in this restitution hearing. To comply with due process, Marrero was entitled to adequate notice that the scope of the hearing had changed. The prosecutor's statement in closing argument was insufficient.

The Attorney General argues that due process was satisfied because Marrero had notice of the prosecution's request prior to the hearing. He does not acknowledge or address the court's statements limiting the scope of the hearing to attorney fees.

While the court's desire to resolve the entire issue of restitution was understandable, it was required to ensure that Marrero had adequate notice that it would do so. Marrero objected based on due process, but the court proceeded anyway. This procedure was fundamentally unfair. (See *Cain*, *supra*, 82 Cal.App.4th at p. 87.) We must therefore reverse the portion of the restitution order covering travel expenses and remand for a new restitution

21

hearing.  We express no opinion on the substantive issue of whether the travel expenses are recoverable as restitution.  This disposition does not affect the portion of the restitution order covering attorney fees.

## DISPOSITION

The order is reversed in part as to the award of travel expenses.  The matter is remanded for a new hearing limited to this issue.  In all other respects, the order is affirmed.


GUERRERO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.